[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-15268
_____

D. C. Docket Nos. 02-22026-CV-FAM
00-01334 MD-FAM

CONNECTICUT STATE DENTAL
ASSOCIATION,

Plaintiff-Appellant,

versus

ANTHEM HEALTH PLANS, INC.,
d.b.a. Anthem Blue Cross &
Blue Shield of CT,

Defendant-Appellee.

_____

No. 08-15277
_____

D. C. Docket Nos. 02-22065-CV-FAM
00-01334 MD-FAM

DDS MARTIN J. RUTT,
DDS MICHAEL EGAN,

Plaintiffs-Appellants,

versus

ANTHEM HEALTH PLANS, INC.,
d.b.a. Anthem Blue Cross &
Blue Shield of CT,

                                                    Defendants-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(December 30, 2009)
**(As Amended 1/11/2010)**

Before BARKETT and HULL, Circuit Judges, and QUIST,[*] District Judge.

QUIST, District Judge:

These consolidated appeals require us to decide whether § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), completely preempts one or more of Plaintiffs' state law claims, thus providing a basis for federal question jurisdiction. Plaintiffs, Martin J. Rutt ("Rutt") D.D.S., Michael Egan ("Egan"), D.D.S., and Connect State Dental Association ("CSDA"), filed separate complaints in Connecticut state court, and Defendant, Anthem Health Plans, Inc. ("Anthem"), removed the cases on the basis of ERISA

_____

[*] Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

preemption. The district court denied Plaintiffs' motions to remand. For the following reasons, we conclude that ERISA completely preempts at least some portions of Rutt and Egan's state law claims but does not preempt CSDA's state law claim. We also conclude that the district court abused its discretion in denying Rutt and Egan's motion to vacate or amend the judgment. Therefore, we affirm in part and reverse in part the order denying Plaintiffs' motions to remand, reverse the order denying Rutt and Egan's motion to vacate or amend, and remand.

## I. BACKGROUND

Rutt and Egan are dentists who practice in Connecticut. CSDA is a membership organization comprised of Connecticut dentists, including Rutt and Egan. Anthem offers and administers managed health and dental plans to employers and employer groups which provide coverage to employees and their eligible dependents. Many of these plans are "employee welfare benefit plans" governed by ERISA. See 29 U.S.C. § 1002(1).

Rutt and Egan participate in Anthem's network of dentists who provide services to individuals enrolled in Anthem's plans. They became participating dentists by entering into contracts with Anthem ("Provider Agreement"), pursuant to which they agreed to provide professional services in exchange for compensation in "the amount specified in the Comprehensive Schedule of Professional Services, or the

3

Usual, Customary and Reasonable allowable determination."[1]

On April 15, 2002, Rutt and Egan filed a five-count class action complaint against Anthem in Connecticut state court, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), negligent misrepresentation, and unjust enrichment. The crux of the allegations was that Anthem employed a number of practices, such as "improper downcoding" and "improper bundling," as a means of underpaying participating dentists for services they performed. CSDA also sued Anthem in state court, alleging in a single count that Anthem violated the CUTPA. The factual allegations mirrored those in Rutt and Egan's complaint.

Anthem removed the cases to the United States District Court for the District of Connecticut on the basis that Plaintiffs' state law claims are completely preempted by ERISA. Plaintiffs filed motions to remand, but before the motions were decided, the cases were transferred by the Joint Judicial Panel on Multi-District Litigation as "tag along" cases in the multi-district litigation titled In re: Managed Care, pending in the Southern District of Florida. The Florida federal district court eventually denied Plaintiffs' motions to remand in brief orders, citing only its previous decision

---

[1]The Provider Agreements at issue were entered into by Anthem's predecessor in interest, Blue Cross & Blue Shield of Connecticut, Inc.

4

on a motion to remand in another case as the basis for denying Plaintiffs' motions.[2]

The district court stayed Plaintiffs' tag-along cases from August 2003 to April 2008, while it addressed the cases and matters on the main track. Prior to the stay, Anthem filed motions to dismiss, and Plaintiffs filed responses. The district court never ruled on these motions. Instead, twice it denied the motions without prejudice but directed Anthem to refile them. Anthem refiled its motions as instructed in November 2007 and again in April 2008. Plaintiffs responded to the November 2007 motions but, due to an error of counsel, failed to respond to the April 2008 motions. The district court thus granted Anthem's motions based on Plaintiffs' failure to respond. Plaintiffs then moved to vacate or amend the orders granting Anthem's motions, but the district court denied the motions, concluding that Plaintiffs had not shown excusable neglect. Plaintiffs timely appealed.

## II. STANDARDS OF REVIEW

We review de novo denials of motions to remand as well as preemption determinations. Henderson v. Wash. Nat'l Ins. Co., 454 F.3d 1278, 1281 (11th Cir. 2006); Anderson v. H & R Block, Inc., 287 F.3d 1038, 1041 (11th Cir. 2002). "We have jurisdiction to consider denial of a motion to remand upon the entry of a final

---

[2]The district court simply referred to a previous decision "regarding Dr. Sutter's motion to remand" but failed to explain why that decision controlled the outcome of Plaintiffs' motions.

order," which occurred in this case on June 6, 2008, when the district court granted Anthem's motions to dismiss. Bailey v. Janssen Pharmaceutica, Inc., 536 F.3d 1202, 1205 (11th Cir. 2008).

We review the district court's denial of the motions to vacate or amend judgment for an abuse of discretion. Lockard v. Equifax, Inc., 163 F.3d 1259, 1267 (11th Cir. 1998).

### III.  MOTION TO REMAND

On a motion to remand, the removing party bears the burden of showing the existence of federal subject matter jurisdiction. Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1373 (11th Cir. 1998).  The test ordinarily applied for determining whether a claim arises under federal law is whether a federal question appears on the face of the plaintiff's well-pleaded complaint. Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152, 29 S. Ct. 42, 43 (1908).  "As a general rule, a case arises under federal law only if it is federal law that creates the cause of action." Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th Cir. 1996) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 8-10, 103 S. Ct. 2841, 2846 (1983)).  Because Plaintiffs' complaints allege only state law claims, there is no jurisdiction under the well-pleaded complaint rule.

Complete preemption is a narrow exception to the well-pleaded complaint rule

and exists where the preemptive force of a federal statute is so extraordinary that it converts an ordinary state law claim into a statutory federal claim. Caterpillar, Inc. v. Williams, 482 U.S. 386, 393, 107 S. Ct. 2425, 2430 (1987). See also Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1212 (11th Cir. 1999) ("When Congress comprehensively occupies a field of law, 'any civil complaint raising this select group of claims is necessarily federal in character' and thus furnishes subject-matter jurisdiction under 28 U.S.C. § 1331.") (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64, 107 S. Ct. 1542, 1546 (1987)). Because federal jurisdiction turns on ERISA preemption, we briefly review the two types of ERISA preemption.

## A. ERISA Preemption

ERISA is one of only a few federal statutes under which two types of preemption may arise: conflict preemption and complete preemption.[3]

Conflict preemption, also known as defensive preemption, is a substantive defense to preempted state law claims. Jones v. LMR Int'l, Inc., 457 F.3d 1174, 1179 (11th Cir. 2006). This type of preemption arises from ERISA's express preemption provision, § 514(a), which preempts any state law claim that "relates to" an ERISA

---

[3]Besides ERISA, complete preemption has been recognized in only a few contexts, including the area of labor contracts under the Labor Management Relations Act of 1947, 29 U.S.C. § 185, et seq., and usury claims against federally-chartered banks under the National Bank Act, 12 U.S.C. § 85, et seq. See Fayard v. Northeast Vehicle Servs., LLC, 533 F.3d 42, 45 (1st Cir. 2008).

plan.[4] 29 U.S.C. § 1144(a). Because conflict preemption is merely a defense, it is not a basis for removal. Gully v. First Nat'l Bank, 299 U.S. 109, 115-16, 57 S. Ct. 96, 99 (1936); see also Ervast v. Flexible Prods. Co., 346 F.3d 1007, 1012 n.6 (11th Cir. 2003) (stating that "defensive preemption . . . provides only an affirmative defense to state law claims and is not a basis for removal").

Complete preemption, also known as super preemption, is a judicially-recognized exception to the well-pleaded complaint rule. It differs from defensive preemption because it is jurisdictional in nature rather than an affirmative defense. Jones, 457 F.3d at 1179 (citing Ervast, 346 F.3d at 1014). Complete preemption under ERISA derives from ERISA's civil enforcement provision, § 502(a), which has such "extraordinary" preemptive power that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Taylor, 481 U.S. at 65-66, 107 S. Ct. at 1547. Consequently, any "cause[] of action within the scope of the civil enforcement provisions of § 502(a) [is] removable to federal court." Id. at 66, 107 S. Ct. at 1548.

---

[4]ERISA § 514(a) provides:

Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) and not exempt under section 4(b).

29 U.S.C. § 1144(a).

8

Although related, complete and defensive preemption are not coextensive:

> Complete preemption is [] narrower than "defensive" ERISA preemption, which broadly "supersede[s] any and all State laws insofar as they . . . *relate to* any [ERISA] plan." ERISA § 514(a), 29 U.S.C. § 1144(a) (emphasis added). Therefore, a state-law claim may be defensively preempted under § 514(a) but not completely preempted under § 502(a). In such a case, the defendant may assert preemption as a defense, but preemption will not provide a basis for removal to federal court.

Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1281 (11th Cir. 2005); accord Ervast, 346 F.3d at 1012 n.6 ("Super preemption is distinguished from defensive preemption, which provides only an affirmative defense to state law claims and is not a basis for removal.").

Because the propriety of removal is at issue, our analysis concerns complete preemption.

For a number of years, this Court has applied the four-part test for ERISA complete preemption set forth in Butero v. Royal Maccabees Life Insurance Co., 174 F.3d 1207 (11th Cir. 1999): (1) "there must be a relevant ERISA plan," (2) "the plaintiff must have standing to sue under that plan," (3) "the defendant must be an ERISA entity," and (4) "the complaint must seek compensatory relief akin to that available under § [502(a)]; often this will be a claim for benefits due under a plan." Id. at 1212. A few years after Butero was decided, the Supreme Court set forth the

9

following inquiry for complete preemption:

> [I]f an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls within the scope of ERISA § 502(a)(1)(B). In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).

Aetna Health Inc. v. Davila, 542 U.S. 200, 210, 124 S. Ct. 2488, 2496 (2004). The Davila test thus requires two inquiries: (1) whether the plaintiff could have brought its claim under § 502(a); and (2) whether no other legal duty supports the plaintiff's claim.

While similar to the Butero test, Davila refines Butero by inquiring about the existence of a separate legal duty, which is not a consideration under Butero. Moreover, a number of other circuits have recognized Davila's two-part test as the proper test for complete preemption under ERISA. See Marin Gen. Hosp. v. Modesto & Empire Traction Co., 581 F.3d 941, 946-47 (9th Cir. 2009); Lone Star OB/GYN Assocs. v. Aetna Health Inc., 579 F.3d 525, 529-30 (5th Cir. 2009); Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund, 538 F.3d 594, 597 (7th Cir. 2008); Negron-Fuentes v. UPS Supply Chain Solutions, 532

F.3d 1, 7 (1st Cir. 2008); Thurman v. Pfizer, Inc., 484 F.3d 855, 860 (6th Cir. 2007);

Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan, 388

F.3d 393, 400 (3d Cir. 2004). In accordance with the Supreme Court's directive, we

too apply Davila.[5]

In Davila, the plaintiffs, a participant and a beneficiary, sued their respective

ERISA plan administrators in state court alleging that they violated the Texas Health

Care Liability Act ("THCLA") by failing to exercise "ordinary care" in denying their

claims for health care benefits under the plans. The defendants removed the cases to

federal district court, arguing that the plaintiffs' claims fell within the scope of

ERISA § 502(a) and were thus completely preempted. Davila, 542 U.S. at 205, 124

---

[5]We recognize that in Cotton v. Massachusetts Mutual Life Insurance Co., 402 F.3d 1267 (11th Cir. 2005), decided after Davila, this Court, sua sponte, conducted a complete preemption analysis of the plaintiffs' original complaint under the Butero test rather than the Davila test. Id. at 1280-1291. The Court's complete preemption analysis in Cotton, however, was dicta and, therefore, our analysis today is not in conflict with Cotton. The plaintiffs in Cotton originally filed only state law claims, but amended their complaint to add a claim for breach of fiduciary duty under ERISA after Massachusetts Mutual ("Mass Mutual") removed the case to federal court. The district court entered a default judgment in favor of the plaintiffs due to Mass Mutual's violation of a discovery order. Id. at 1270. This Court concluded that no relief was available to the plaintiffs under ERISA because Mass Mutual was not acting as an ERISA fiduciary for any purpose relevant to the alleged misconduct, and reversed and remanded with instructions that the plaintiffs' ERISA claims be dismissed with prejudice. Id. at 1280, 1294. The Court then undertook a complete preemption analysis of the plaintiffs' claims in the original complaint only "because it helps to clarify that Mass Mutual was not wearing its fiduciary hat when it allegedly misled the plaintiffs regarding future benefits under their policies." Id. at 1280. Because the plaintiffs had amended their complaint after removal to add an ERISA claim, this Court had jurisdiction over the claim regardless of whether the original claims were completely preempted and removal was improper. Id. at 1280.

11

S. Ct. at 2493. The Court first considered whether the plaintiffs' claims were among the types of actions that fall within the scope of ERISA § 502(a)(1)(B) by "examin[ing] [the plaintiffs'] complaints, the statute on which their claims are based (the THCLA), and the various plan documents." Id. at 211, 124 S. Ct. at 2496. In both instances, the plaintiff's claim was based solely on the plan's denial of benefits under the plan, and the defendant's only relationship with the plaintiff was the administrator of the plaintiff's employer's ERISA plan. The Court concluded that the plaintiffs could have brought their claims under ERISA § 502(a)(1)(B) because they "complain[ed] only about denials of coverage promised under the terms of ERISA-regulated employee benefit plans" and could have resorted to their remedies under ERISA by filing a claim for benefits and/or seeking a preliminary injunction. Id. at 211-12, 124 S. Ct. at 2497.

The Court then turned to the second part of the test – the existence of an independent duty – and concluded that the duty upon which the plaintiffs' claims were based did not arise independently of the plans. The plaintiffs argued that the duty of ordinary care imposed under the THCLA was a duty independent of any duty imposed by ERISA or the plan terms and, thus, was not a duty implicated by ERISA's civil enforcement provision. Not so, the Court reasoned. It noted that while the THCLA does impose a duty on managed care entities to use "ordinary care" in

12

making health care decisions, if a plan correctly concluded that a particular treatment was not covered, "the failure of the plan itself to cover the requested treatment would be the proximate cause" of any injuries arising from the denial. Id. at 212-13, 124 S. Ct. at 2497 (footnote omitted). Moreover, the Court observed, because the THCLA does not obligate a managed health care entity to provide any particular coverage, "interpretation of the terms of [the plaintiffs'] benefit plans forms an essential part of their THCLA claim . . . and liability would exist [] only because of [the defendants'] administration of ERISA-regulated benefit plans." Id. at 213, 124 S. Ct. at 2498. In other words, the Court explained, the defendants' "potential liability under the THCLA in these cases . . . derives entirely from the particular rights and obligations established by the benefit plans." Id.

## B.    Rutt and Egan's Complaint

Before turning to the preemption analysis of Rutt and Egan's complaint, we make some general observations regarding complete preemption of healthcare provider claims under ERISA.

First, healthcare provider claims are usually not subject to complete preemption because "[h]ealthcare providers . . . generally are not considered 'beneficiaries' or 'participants' under ERISA."[6] Hobbs v. Blue Cross Blue Shield of Ala., 276 F. 3d

---

[6]A "participant" includes

13

1236, 1241 (11th Cir. 2001) (citing Cagle v. Bruner, 112 F.3d 1510, 1514 (11th Cir. 1997)); see also Pascack Valley Hosp., 388 F.3d at 400 ("We conclude that the Hospital could not have brought its claims under § 502(a) because the Hospital does not have standing to sue under that statute."); In re Managed Care Litig., 298 F. Supp. 2d 1290 (S.D. Fla. 2003) (noting that only two categories of individuals – participants and beneficiaries – are authorized to sue for benefits under § 502(a)(1)(B)). Moreover, such claims often are not the type of claims that could be brought under § 502(a) because they do not "duplicate[], supplement[], or supplant[] the ERISA civil enforcement remedy." Davila, 542 U.S. at 209, 124 S. Ct. at 2495. For example, a healthcare provider's claims of negligent misrepresentation and estoppel based on a plan's oral misrepresentations are not ERISA claims because they do not arise from the plan or its terms.[7] Franciscan Skemp, 538 F.3d at 597.

---

any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7). A "beneficiary is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

[7]In the context of defensive preemption, this Court has similarly concluded that healthcare provider claims for negligent misrepresentation are not preempted. Lordmann Enters., Inc. v. Equicor, Inc., 32 F.3d 1529, 1533 (11th Cir. 1994); see also Transitional Hosps. Corp. v. Blue Cross & Blue Shield of Texas, Inc., 164 F.3d 952, 954 (5th Cir. 1999) (noting in the context of defensive preemption that "ERISA does not preempt state law when the state-law claim is

Second, it is well-established in this and most other circuits that a healthcare provider may acquire derivative standing to sue under ERISA by obtaining a written assignment from a "participant" or "beneficiary" of his right to payment of medical benefits. Hobbs, 276 F.3d at 1241 (citing Cagle, 112 F.3d at 1512-16). Claims for benefits by healthcare providers pursuant to an assignment are thus within the scope of § 502(a).

Finally, a provider that has received an assignment of benefits and has a state law claim independent of the claim arising under the assignment holds two separate claims. In such a case, the provider may assert a claim for benefits under ERISA, the state law claim, or both. See Franciscan Skemp, 538 F.3d at 598 ("Franciscan Skemp *could* bring ERISA claims in Romine's shoes as a beneficiary for the denial of benefits under the plan; but it has not. . . . Franciscan Skemp is basing its claims on a conversation to which Romine was not even a party.") (emphasis in original); Marin Gen. Hosp. v. Modesto & Empire Traction Co., 581 F.3d 941, 947 (9th Cir. 2009) (noting that the plaintiff-hospital's instant claim was based on a telephone conversation in which the plan had agreed to pay 90% of the patient's charges and that the hospital had already been paid part of the charges pursuant to an assignment

brought by an independent, third-party health care provider (such as a hospital) against an insurer for its negligent misrepresentation regarding the existence of health care coverage").

15

from the patient).  Thus, so long as the provider's state law claim does not fall within § 502(a), the existence of the assignment is irrelevant to complete preemption if the provider asserts no claim under the assignment.  Sheridan Healthcorp., Inc. v. Neighborhood Health P'ship, Inc., 459 F. Supp. 2d 1269, 1274 (S.D. Fla. 2006).

The Third, Fifth, and Ninth Circuits have applied these principals to determine the line of demarcation between ERISA and state law claims in actions brought by healthcare providers.

In Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc., 187 F.3d 1045 (9th Cir. 1999), the Ninth Circuit held that healthcare providers' claims for breach of their provider agreements with Blue Cross were not completely preempted, even though they had received assignments from patients who were beneficiaries of ERISA plans.  The providers' agreements with Blue Cross required Blue Cross to identify providers in the information it distributed to members of the plan and to direct members to those providers.  Id. at 1048.  In return, the providers agreed to accept payment from Blue Cross for the services they rendered pursuant to specified fee schedules.  Id.  After Blue Cross changed the fee schedules, the providers filed a class action in state court alleging that Blue Cross breached the provider agreements by improperly amending the fee schedules and by violating its implied duty of good faith and fair dealing under California law.  Blue Cross

16

thereafter removed the case to federal court. The federal district court remanded the case to state court.

On appeal, the Ninth Circuit held that the providers' breach of contract claims were not within the scope of § 502(a)(1)(B) because the providers' breach of contract claims arose solely out of their provider agreements. In other words, the claims were not claims for benefits that could be asserted by the patients-assignors. Id. at 1050. The Ninth Circuit differentiated the breach of provider contract claims from assignment-based ERISA claims as follows:

> [T]he Providers are asserting contractual breaches, and related violations of the implied duty of good faith and fair dealing, that their patient-assignors could not assert: the patients simply are not parties to the provider agreements between the Providers and Blue Cross. The dispute here is not over the *right* to payment, which might be said to depend on the patients' assignments to the Providers, but the *amount*, or level, of payment, which depends on the terms of the provider agreements.

Id. at 1051 (emphasis in original). Because the providers' state law claims arose out of separate agreements with Blue Cross that governed their provision of goods and services to plan members, the assignments were irrelevant to preemption. Id. at 1052.

The Third Circuit, in Pascack Valley Hospital, Inc. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393 (3d Cir. 2004), a post-Davila case, found no preemption under facts similar to those in Anesthesia Care. In Pascack Valley, the plaintiff hospital entered into a "Network Hospital Agreement" with MagNet, an

17

independent consultant that had organized a provider network to provide services at discounted rates to beneficiaries of group health plans in exchange for the plans' promises to encourage beneficiaries to use network providers. Id. at 396. There were two contracts, the agreement between the hospital and MagNet and the agreement between MagNet and the plan, or subscriber ("Subscriber Agreement"). The Subscriber Agreement required the plan to pay the hospital within a certain time, otherwise the plan would forfeit the discounted rate. The hospital submitted claims for services provided to two ERISA beneficiaries. The defendant plan paid the claims, but the hospital asserted that the payment was untimely and the plan had forfeited the discounted rate. Id. The hospital sued the plan in state court alleging that it was a third party beneficiary of the Subscriber Agreement, and the plan removed to federal court.

Applying Davila, the Third Circuit concluded the hospital's claims were not completely preempted because the hospital lacked standing to sue under § 502(a). Id. at 400. More specifically, the court found that the plan, as the removing party, failed to meet its burden of showing that the hospital had obtained an assignment – a requisite of derivative standing.[8]  Id. at 401. Although this conclusion was

_____

[8]The Third Circuit did not reach the question of whether derivative standing can be obtained by assignment under ERISA. Pascack Valley Hosp., Inc., 388 F.3d at 401 n.7. Previously, the Third Circuit in dicta expressed doubt as to the validity of assignments under ERISA. Northeast Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund, 764 F.2d 147, 153-54 & n.6 (3d Cir. 1985).

18

dispositive, the court went on to observe that even if the hospital had an assignment, its claims would not be preempted under Davila because they were based on a separate duty independent of ERISA. While it acknowledged that the hospital's claims existed only because of an ERISA plan, the court observed that claims at issue did not implicate the plan:

> Coverage and eligibility . . are not in dispute. Instead the resolution of this lawsuit requires interpretation of the Subscriber Agreement, not the Plan. The Hospital's right to recover, if it exists, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself.

Id. at 403 (citing Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S. Ct. 2425 (1987)). The court also identified a number of compelling similarities between that case and Anesthesia Care: (1) the hospital's claims arose from an agreement independent of the plan; (2) participants and beneficiaries of the plan were apparently not parties to the Subscriber Agreement; and (3) the dispute was unrelated to assignments or the plan terms because it involved the amount of payment under the Subscriber Agreement, not the right to payment, which might require interpretation of the plan. Id. at 403-404 (quoting Anesthesia Care, 187 F.3d at 1051).

In a recent decision, Lone Star OB/GYN Associates v. Aetna Health Inc., 579 F.3d 525 (5th Cir. 2009), the Fifth Circuit adopted the Ninth Circuit's "rate of payment" versus "right of payment" test for distinguishing a provider's state law

contract-based claims from a claim for benefits under ERISA. The plaintiff, Lone Star, entered into a provider agreement with Aetna, an insurer that administered ERISA plans. Lone Star sued Aetna in state court under the Texas Prompt Pay Act ("TPPA"), alleging that Aetna had not paid Lone Star's claims for services at the rates set forth in the provider agreement. Lone Star attached a list of the disputed claims to its complaint. Aetna removed the case, citing certain payment claims it argued were preempted because coverage had been denied. The district court granted Lone Star leave to amend its pleadings to remove the claims that were denied for lack of coverage and then granted Lone Star's motion to remand on the basis that all of the remaining claims had been partially paid. Id. at 528.

Because Lone Star's standing was not at issue, the Fifth Circuit's preemption analysis under Davila turned on whether Lone Star's allegation that Aetna failed to pay claims at the rate established in the provider agreement was based on a duty independent of the ERISA plan at issue. While acknowledging that the provider agreement and the plan cross-referenced each other and it might be necessary to refer to the plan in order to determine the correct payment rate, the court held that Lone Star's claims arose independently of the plan:

> Though the plan and the Provider Agreement cross-reference each other, the terms of the plan - in particular, those related to coverage - are not at issue in a dispute over whether Aetna paid the correct rate for covered services as set out in the Provider Agreement. While Aetna is correct

20

that any determination of benefits under the terms of a plan - i.e., what is "medically necessary" or a "Covered Service" - does fall within ERISA, Lone Star's claims are entirely separate from coverage and arise out of the independent legal duty contained in the contract and the TPPA.

Id. at 530-31. Notwithstanding this conclusion, the court recognized that Lone Star's claims may still be at least partially preempted because Aetna asserted that some of the partially paid claims actually reflected partial denials of services that were not covered. Lone Star disputed this characterization, but the record was insufficient to allow the court to resolve the factual issue. In order to guide the district court on remand, the Fifth Circuit held that while claims involving only underpayment are not preempted, claims that were partially denied because coverage was not afforded for all the submitted procedures may be preempted. Id. at 533.

We agree with these courts that the "rate of payment" and "right of payment" distinction is a useful means for assessing preemption of healthcare provider claims based upon a breach of an agreement separate from an ERISA plan and thus apply it in considering Rutt and Egan's claims.

### 1. First Davila Inquiry

The first inquiry is whether Rutt and Egan, "at some point in time, could have brought [their] claim under ERISA § 502(b)(1)(B)." Davila, 542 U.S. at 210, 124 S. Ct. at 2496. This part of the test is satisfied if two requirements are met: (1) the

21

plaintiff's claim must fall within the scope of ERISA; and (2) the plaintiff must have standing to sue under ERISA. Id. at 211-12, 124 S. Ct. at 2496-97; Marin Gen. Hosp., 581 F.3d at 947-49. We first consider whether the claims are within the scope of § 502(a)(1)(B), because if they are not, standing to assert them is irrelevant.

Rutt and Egan argue that their claims are not cognizable under § 502(a) because the relief they seek is unavailable under ERISA. They stress that they are not seeking benefits under an ERISA plan, but instead seek to collect unpaid amounts they are owed under their Provider Agreements as a result of Anthem's use of improper payment methods, such as downcoding and bundling, under the guise of utilization review. Moreover, they assert, their state law claims are the types of claims federal courts have consistently held are not even defensively preempted under ERISA § 514. The Court emphasized in Davila, however, that merely referring to labels affixed to claims to distinguish between preempted and non-preempted claims is not helpful because doing so "would 'elevate form over substance and allow parties to evade' the pre-emptive scope of ERISA." Davila, 542 U.S. at 214, 124 S. Ct. at 2498 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911 (1985)).

The factual allegations of the complaint do support Rutt and Egan's argument

that their claims involve the "rate of payment" under their Provider Agreements.[9]

Yet, a closer look discloses more. Plaintiffs' allegations implicate not only the "rate of payment" under their Provider Agreements, but also the "right of payment." For example, in paragraph 10(a) under Class Allegations, Rutt and Egan allege that Anthem breached its contractual obligations by engaging in various acts, including "systematically denying and/or reducing Dentists' reimbursement for medically necessary services through (i) improper denials." And, in paragraph 10(b), Rutt and Egan allege that Anthem denied "medically necessary claims through the use of so-called 'guidelines' which do not comply with accepted medical/dental treatment standards." As the Fifth Circuit observed in Lone Star, such allegations concern coverage issues that fall within ERISA. Lone Star, 579 F.3d at 531. Finally, paragraphs 10(g) and (h) complain that Anthem committed ERISA procedural violations by "failing to provide an adequate explanation for the denial of claims for reimbursement" and "failing to ensure that procedures exist to properly consider plaintiffs' and members of the class' claims for reimbursement, both initially and in the appeals process." Significantly, the Provider Agreements say nothing about Anthem's obligations to provide an explanation when it denies a claim for

---

[9]Although Plaintiffs reference their amended complaints in their briefs, we consider the original complaints because removal jurisdiction is determined at the time of removal, and "events occurring after removal . . . do not oust the district court's jurisdiction." Poore v. Am.-Amicable Life Ins. Co., 218 F.3d 1287, 1290-91 (11th Cir. 2000). Even so, Plaintiffs state that their amended complaints did not affect any substantive changes in their pleadings.

reimbursement or to provide procedures for reviewing claims for reimbursement. Rather, ERISA § 503 imposes those obligations. 29 U.S.C. § 1133(1) and (2) (requiring every ERISA plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits . . . has been denied" and to "afford a reasonable opportunity . . . for a full and fair review" of denied claims). Rutt and Egan repeated these same allegations in paragraphs 21(a), (g) and (h) as part of their general Factual Allegations and again in paragraphs 26(a), (g) and (h) as part of their breach of contract claim.[10]

What we have, then, is really a hybrid claim, part of which is within § 502(a) and part of which is beyond the scope of ERISA. Because Rutt and Egan complain, at least in part, about denials of benefits and other ERISA violations, their breach of contract claim implicates ERISA.

Rutt and Egan must have had standing to assert ERISA claims, and because they are providers, they could only have derivative standing through assignments. Thus, unlike Anesthesia Care, supra, the existence of assignments does matter in this case. In the district court, Anthem presented claim forms that Rutt and Egan submitted to Anthem for reimbursement for dental services. Lynn Appicelli, a Project

---

[10]The claims for breach of the duty of good faith and fair dealing and violation of the CUTPA in Counts 2 and 3 contain allegations similar to the breach of contract allegations implicating ERISA.

Manager in Anthem's Government Programs division, confirmed in an affidavit that the attached forms were typical of claim forms that Anthem receives from Connecticut dentists. The claim forms contain the following language: "I hereby authorize payment of the dental benefits otherwise payable to me directly to the below named dental entity." Anthem contends that these claim forms suffice to show an assignment of benefits by Rutt's and Egan's patients. We agree.

Rutt and Egan contend that the claim forms cannot be valid assignments for two reasons, both of which we reject.[11] First, they point out that each of the three sample plan documents Anthem submitted preclude assignments. For example, they note that the first plan states: "The Member or Covered Person may not assign benefits to a provider, except when parents are divorced." Citing <u>Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.</u>, 371 F.3d 1291 (11th Cir. 2004), in which this Court held that an unambiguous anti-assignment provision renders an assignment ineffective, Rutt and Egan contend that any purported assignment by their patients was invalid. As Anthem notes, however, each

---

[11]Rutt and Egan also contend that the assignments are not valid under Connecticut law. Because they raised this argument for the first time in their reply brief, we treat this argument as waived. <u>United States v. Evans</u>, 473 F.3d 1115, 1120 (11th Cir. 2006) (arguments first raised in reply brief are deemed not properly preserved). In any event, even though the claim forms do not contain the names and signatures of the patients, Rutt and Egan represented that the signatures are on file in their offices and there is sufficient information on the forms to match the patient with the particular employer plan under which the right to payment has been assigned.

of the sample plans also contains an exception specifically permitting the assignment of dental benefits: "Notwithstanding the terms of any provision regarding the payment of benefits . . . a Member may assign the benefits to a Dentist or oral surgeon . . . in accordance with the Connecticut Laws concerning Assignment of Benefits to a Dentist or oral surgeon." Thus, the plans specifically authorized the assignments to Rutt and Egan.

Rutt and Egan also contend that the claim forms are ineffective to create standing because they convey only the right to receive payment of benefits and not the patient's right to file an action under § 502(a). They cite a number of unreported district court cases holding that an assignment of the right to payment of benefits that does not include the right to pursue litigation is not an unequivocal assignment that creates derivative ERISA standing. See North Jersey Ctr. for Surgery, P.A. v. Horizon Blue Cross Blue Shield of N.J., Inc., No. 07-4812 (HAA), 2008 WL 4371754, at *8 (D.N.J. Sept. 18, 2008) ("The scope of the assignment is essential to establishing derivative standing as courts have made distinctions between assignments that only give the provider the right to reimbursement for medical services - which are not ERISA claims - and assignments that give the provider a full assignment of benefits, which are ERISA claims.") (citing Cooper Hosp. Univ. Med. Ctr. v. Seafarers Health & Benefits Plan, No. 05-5941, 2007 WL 2793372, at *3

26

(D.N.J. Sept. 25, 2007), and <u>Touro Infirmary v. Am. Mar. Officer</u>, No. 07-1441, 2007 WL 4181506, at *3-6 (E.D. La. Nov. 21, 2007)); <u>Somerset Orthopedic Assocs., P.A. v. Aetna Life Ins. Co.</u>, No. 06-867 (MLC), 2007 WL 432986, at *2 (D.N.J. Feb. 2, 2007) (holding that the defendant failed to show an assignment sufficient for ERISA preemption purposes, "as the assignment authorizes nothing more than direct payment to the plaintiff"). We find these cases unpersuasive and decline to follow them. Our own cases confirm that assignment of the right to payment is enough to create standing. "Healthcare providers may acquire derivative standing . . . by obtaining a written assignment from a 'beneficiary' or 'participant' of his right to payment of benefits under an ERISA-governed plan." <u>Physicians Multispecialty Group</u>, 371 F.3d at 1294 (citing <u>Hobbs</u>, 276 F.3d at 1241); <u>see also</u> <u>HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.</u>, 240 F.3d 982, 989, 991 (11th Cir. 2001) (recognizing standing based on an assignment authorizing payment of insurance benefits directly to the provider). Moreover, as noted in <u>Cagle v. Bruner</u>, 112 F.3d 1510 (11th Cir. 1997), in which this Court first recognized derivative standing, an assignment furthers ERISA's purposes only if the provider can enforce the right to payment.

> Of course, an assignment will not facilitate a plan participant's or beneficiary's receipt of benefits if the plan does not pay the benefits it owes, and provider-assignees are not permitted to sue on the participant's or beneficiary's behalf. If provider-assignees cannot sue the ERISA plan for payment, they will bill the participant or beneficiary directly for the insured medical bills, and the participant or beneficiary

27

> will be required to bring suit against the benefit plan when claims go unpaid. On the other hand, if provider-assignees can sue for payment of benefits, an assignment will transfer the burden of bringing suit from plan participants and beneficiaries to "providers[, who] are better situated and financed to pursue an action for benefits owed for their services."

Id. at 1515 (citations omitted) (alteration in original). See also I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 7 F. Supp. 2d 79, 84 (D. Mass. 1998) ("An assignment to receive payment of benefits necessarily incorporates the right to seek payment. As Plaintiff argues, the right to receive benefits would be hollow without such enforcement capabilities."). Finally, as the Seventh Circuit observed in Kennedy v. Connecticut General Life Insurance Co., 924 F.2d 698 (7th Cir. 1991), cited with approval in Cagle, all one needs for standing under ERISA is a colorable claim for benefits, and "[t]he possibility of direct payment is enough to establish subject matter jurisdiction." Id. at 700-01. Rutt's and Egan's rights to direct payment of benefits are thus sufficient to confer standing.

We conclude that Anthem has carried its burden of showing that Rutt and Egan received valid assignments from their ERISA patients. Furthermore, although Anthem did not link any particular assignment to a particular ERISA plan, the Appicelli affidavit sufficiently demonstrates that the submitted assignments in the claim forms are representative of assignments Rutt and Egan received for services they rendered, which would necessarily include patients covered by ERISA plans

28

administered by Anthem.

## 2. Second <u>Davila</u> Inquiry

The second inquiry is whether Rutt's and Egan's claims are predicated on a legal duty that is independent of ERISA. Our analysis above answers this question. Rutt and Egan argue that their claims are based on a separate legal duty arising from their Provider Agreements. This is true to the extent their claims implicate only the amount they were owed under their Provider Agreements. But, as noted, their claims stray from the boundaries of their Provider Agreements into ERISA territory by asserting improper denials of medically necessary claims and violations of ERISA procedural requirements. Consequently, portions of their claims arise solely under ERISA or ERISA plans and not from any independent legal duty.

As for the remaining claims, where removal jurisdiction exists over a completely preempted claim, the district court has jurisdiction over any claims joined with the preempted claim. <u>Butero</u>, 174 F.3d at 1215 (citing 28 U.S.C. § 1441(c)). Therefore, the district court may exercise jurisdiction over Rutt's and Egan's non-preempted state law claims, including those claims for payment in connection with non-ERISA patients.

## C. CSDA's Complaint

CSDA's allegations in its single-count complaint are essentially the same as

those of Egan and Rutt, in that they assert Anthem violated the CUTPA through improper denials of necessary services and failing to comply with ERISA's procedural requirements. The question, then, is whether CSDA, as an association, has standing under ERISA. CSDA contends that it lacks standing because it provided no services and thus could not have obtained derivative standing through an assignment. Anthem argues that CSDA need not obtain assignments or provide medical services to obtain standing because it has associational standing though the assignments that some of its members (Rutt and Egan) have obtained.

Although this Court has not considered the issue, other courts have concluded that a trade group may obtain statutory standing under ERISA through associational standing. See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 284-87 (3d Cir. 2002) (holding that an association of psychiatrists may have associational standing to assert claims on behalf of its members against managed care organizations); Self-Ins. Inst. of Am., Inc. v. Korioth, 993 F.2d 479, 484-85 (5th Cir. 1993) (concluding that a trade group of employers and plan sponsors had statutory standing because its members were fiduciaries who would have standing to sue in their own right); So. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill., 326 F.3d 919, 922 (7th Cir. 2003) (holding that a union had standing to sue if its members were participants in the ERISA plan being challenged).

A trade association has standing to sue on behalf of its members when three requirements are met: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977). Even if CSDA met the first two requirements for associational standing, it cannot meet the last one. Generally, an association seeking damages on behalf of its members cannot claim associational standing. See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 554, 116 S. Ct. 1529, 1535 (1996). Damage claims are incompatible with associational standing because such claims usually require "individualized proof." Warth v. Seldin, 422 U.S. 490, 515-16, 95 S. Ct. 2197, 2214 (1975). Although CSDA seeks both declaratory and injunctive relief, which are normally appropriate relief for associational standing, it also seeks compensatory and punitive damages on behalf of its members, which will require individualized proof of harm. Thus, CSDA could not establish all the requirements for associational standing. Consequently, CSDA's claim is not completely preempted because it lacks standing to sue under ERISA.

**IV. MOTION TO AMEND JUDGMENT**

31

When the instant cases were transferred to the Southern District of Florida, they were docketed as tag along cases to the main case, No. 00-MD-1334 (the "1334 docket"). In July 2002, the district court administratively closed the tag along cases. Over the next five and one-half years, all motions and pleadings pertaining to the tag along cases were filed solely on the 1334 docket. During this time, Plaintiffs' counsel filed various motions, briefs, reports, and other documents on the 1334 docket.

Anthem filed motions to dismiss on July 16, 2003, and Plaintiffs filed responses to these motions. On August 21, 2003, the district court stayed all tag along cases. In October 2007, the district court denied all pending motions without prejudice with instructions to refile. Anthem refiled its motions to dismiss on November 9, 2007, and Plaintiffs filed responses.

On January 26, 2008, the district court entered an order on both the 1334 docket and in the tag along cases directing the parties in tag along cases to file all documents only on the docket of the tag along case. On February 7, 2008, the court entered an order on the 1334 docket directing all counsel to file an appearance in the docket of all tag along cases in which they were involved. Plaintiffs' counsel did not file appearances in the tag along cases as directed. On February 19, 2008, the court entered an order on both the 1334 docket and in the tag along cases denying all pending motions and directing counsel to file status reports on the dockets of the tag

along cases. Plaintiffs' counsel received the order by electronic notification through the 1334 docket, but erroneously filed status reports on the 1334 docket rather than in the tag along case. Finally, on April 14, 2008, the court entered an order in the tag along cases reopening the cases and setting a briefing schedule for motions to be filed in those cases. Because Plaintiffs' counsel had not filed an appearance in the tag along cases, Plaintiffs' counsel did not receive electronic notice of this order.

Anthem refiled its motions to dismiss for a for a third time on April 30, 2008. Plaintiffs' counsel did not receive electronic notification of the motion, but they did receive a paper copy of the motion, which Anthem served by mail. When Plaintiffs failed to respond to Anthem's motions, the district court entered an order granting the motions and dismissing the case.

Plaintiffs filed motions to vacate the judgment on June 16, 2008, ten days after the district court entered the orders of dismissal. Plaintiffs argued that their failure to respond to Anthem's motions was excusable neglect due to their counsels' belief that they were receiving all electronic filings from both the 1334 docket and the tag along dockets and were unaware that Anthem had refiled its motion to dismiss. Plaintiffs explained that they mistakenly believed that prior appearances and a motion to appear pro hac vice had functioned as appearances in the tag along cases.

The district court denied the motion. It reasoned that Plaintiffs failed to

33

comply with the January 26, February 7, February 19, and April 14 orders and failed to respond to Anthem's motion, even though Plaintiffs' counsel received three of the orders electronically and received a paper copy of the motion by mail. The court concluded that these circumstances did not constitute excusable neglect.

Rule 60(b)(1) of the Federal Rules of Civil Procedure authorizes a court to relieve a party from a final judgment or order upon a showing of "mistake, inadvertence, surprise, or excusable neglect." "Rule 60(b) motions are directed to the sound discretion of the district court, and we will set aside the denial of relief from such motion only for abuse of that discretion." Cheney v. Anchor Glass Container Corp., 71 F.3d 848, 849 n.2 (11th Cir. 1996).

Excusable neglect is generally an "equitable inquiry" based upon the particular circumstances of the case. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 1495 (1993). In Pioneer, the Court held that an attorney's inadvertent failure to timely file a proof of claim can constitute excusable neglect under Bankruptcy Rule 9006(b)(1). Looking to other rules for guidance on the meaning of "excusable neglect," the Court considered Rule 60(b)(1) and observed that "for purposes of Rule 60(b), 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." Id. at 394, 113 S. Ct. at 1497. The Court identified four factors pertinent

34

to the determination: "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Id. at 395, 113 S. Ct. at 1498.

This Court applied the Pioneer factors in Cheney v. Anchor Glass Container Corp., 71 F.3d 848 (11th Cir. 1996), holding that the plaintiff's counsel's late filing of a request for a trial de novo following a non-binding arbitration award was excusable neglect. The delayed filing resulted from a miscommunication between the plaintiff's lead counsel and his associate who handled the arbitration while the lead counsel was on vacation – each had assumed that the other had filed a demand for trial de novo. Id. at 849. The court held that the district court abused its discretion in failing to find excusable neglect. We noted that the Pioneer factors weighed in favor of excusable neglect because the defendant was not prejudiced by the late filing. Id. at 850. We also observed that although the error was within counsel's control, the miscommunication was attributable solely to negligence. Id. Finally, there was no indication that the delay was the result of bad faith, i.e., an attempt to gain a tactical advantage through the late filing. Id.

In this case, the district court abused its discretion because it did not even consider the Pioneer factors. See Cheney, 71 F.3d at 850. Instead, the district court

concluded that Plaintiffs' counsel's error was not excusable because counsel failed to comply with a series of orders. But as Plaintiffs note, their failure to respond to Anthem's motions was a result of their single failure to file appearances on the tag along dockets as directed by the February 7 order. In other words, while it is true that Plaintiffs violated the January 26 and February 19 orders by filing their status reports on the 1334 docket rather than in the tag along case, those violations did not lead to Plaintiffs' lack of knowledge that Anthem had refiled its motions. Through an affidavit of counsel, Plaintiffs explained to the district court that they had filed several previous appearances and mistakenly believed that they were receiving ECF notifications for filings in all cases, including the tag along cases. It was counsel's erroneous assumption, rather than purposeful disregard of the district court's order, that led to the failure to respond.[12]

Anthem argues that the district court properly denied Plaintiffs' motion because counsel failed to read or understand the district court's orders. While it is true that this circuit recognizes that an attorney's misinterpretation of the law does not constitute excusable neglect, see <u>Advanced Estimating Sys., Inc. v. Riney</u>, 130 F.3d

---

[12]Regarding the paper copies of the motions that Anthem mailed to Plaintiff's counsel, counsel explained in his affidavit that his law firm's staff placed the motions in a pile of paper documents to be filed in the case. Paper copies of the motions were also mailed to Plaintiffs' local counsel in Florida, but Plaintiffs contend that local counsel assisted with filings only, and relied on Plaintiffs' counsel in Connecticut to litigate the case.

996, 998 (11th Cir. 1997) (holding that "attorney's misunderstanding of the plain language of a [court] rule cannot constitute excusable neglect such that a party is relieved of the consequences of failing to comply with a statutory deadline"); Cavaliere v. Allstate Ins. Co., 996 F.2d 1111, 1115 (11th Cir. 1993) (concluding that the district court did not abuse its discretion in denying the plaintiff's motion where counsel's interpretation of Fed. R. Civ. P 6(e) was contrary to case law), Plaintiffs' counsel's error is properly characterized as a mistake of fact rather than a mistake of law. For that reason, the facts in this case are more like those in Cheney, where "[t]he reason for the delayed filing was a failure in communication between the associate attorney and the lead counsel," 71 F.3d at 850, than those in Advanced Estimating System, Inc. or Cavaliere.

Turning to the Pioneer factors, we conclude that they all weigh in favor of granting Plaintiffs relief. First, in spite of Anthem's arguments to the contrary, there is no discernable prejudice to Anthem as a result of the delay. The delay was brief. Plaintiffs filed their motions only ten days after the district court entered the orders granting Anthem's motions to dismiss and only seven days after counsel first learned of the district court's order. Anthem contends that it is prejudiced because it expected to win the motions, which would have concluded the litigation. But the inquiry is whether prejudice results from the *delay*, not from having to continue to litigate the

37

case. See Walter v. Blue Cross & Blue Shield United of Wisc., 181 F.3d 1198, 1202 (noting that "Blue Cross of Wisconsin admitted that it had not suffered any prejudice from Walter's delay"); Lacy v. Sitel Corp., 227 F.3d 290, 293 (5th Cir. 2000) ("There is no prejudice to the plaintiff where the setting aside of the default has done no harm to plaintiff except to require it to prove its case."). Second, there is no reason to conclude that allowing Plaintiffs to file their untimely response to Anthem's motion would adversely affect the judicial proceedings or impose an additional burden on the district court. As noted, Anthem filed its motion three times and Plaintiffs responded twice. Given Plaintiffs' record, it was to be expected that Plaintiffs would respond to Anthem's third motion and that the district court would eventually rule on the merits. Anthem incorrectly states that the district court would have had to adjudicate the motion for a third time, but the district court never addressed the merits; instead, it dismissed the motions without prejudice. Certainly the district court would have to commit resources to deciding Anthem's motion if it considered Plaintiffs' late response, but this is typically the case for any motion for relief from judgment. Third, the reason for the delay was counsel's erroneous assumption that its previous appearances had been filed in the tag along cases and that it was receiving all ECF filings as well as local counsel's failure to notify Plaintiffs' Connecticut counsel that they had received the motion by mail, presumably due to the same erroneous

38

assumption that Plaintiffs' Connecticut counsel was receiving the ECF filings and saw the motions. While counsel certainly could have done more, there is no indication that they acted willfully. Finally, there is no suggestion in the record that Plaintiffs exhibited a lack of good faith in failing to file an appearance on the tag along dockets or in not responding to Anthem's motion. On the contrary, Plaintiffs' active record in the litigation clearly shows that Plaintiffs' counsel intended to respond to all of Anthem's motions and that its failure to do so was careless, but excusable, conduct.

Accordingly, the district court abused its discretion by not finding excusable neglect under the Pioneer factors and failing to grant Plaintiffs' motion.

## V. CONCLUSION

For the foregoing reasons, we: (1) affirm that portion of the district court's order, dated August 26, 2003, denying Rutt and Egan's motion to remand, but reverse that portion of the order denying CSDA's motion to remand, and (2) reverse the district court's order, dated August 19, 2008, denying Rutt and Egan's motion to vacate or amend judgment (the judgment being the district court's prior order dated June 6, 2008 dismissing Rutt's and Egan's case against Anthem). We remand Case No. 08-15268 to the district court with instructions to remand CSDA's complaint to state court. We remand Case No. 08-15277 for further

39

proceedings on the merits of Rutt's and Egan's claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**